**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| John Kristoffer Larsgard,<br>Petitioner<br>-vs-<br>Charles L. Ryan, et al.,<br>Respondents. | CV-14-8092-PCT-SPL (JFM)<br><br>**Report & Recommendation**<br>**on Petition for Writ of Habeas Corpus** |

## I. MATTER UNDER CONSIDERATION

Petitioner, presently incarcerated in the Arizona State Prison Complex, filed through counsel a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on June 9, 2014 (Doc. 1).  On October 28, 2014 Respondents filed their Response (Doc. 9). Petitioner filed a Reply on December 16, 2014 (Doc. 12).

The Petitioner's Petition is now ripe for consideration.   Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

## A. FACTUAL BACKGROUND

On or about September 24, 2011, Petitioner was involved in a series of incidents in which witnesses claimed that Petitioner had driven the wrong way down a one-way street in Winslow, Arizona, and responded to objecting bystanders (including children) by trying to run them over with his car.  When police arrived, Petitioner was observed trying to leave the scene in the damaged car.  Upon being arrested, Petitioner made

1

statement to the officer about being under the influence of pain medication he had received earlier at the hospital as the result of an earlier one vehicle accident, as well as medication he normally takes for a past neck injury.  (Exhibit KK, Presentence Report at 1-4.)  (Exhibits to the Answer, Doc. 9, are referenced herein as "Exhibit ___.")

**B. PROCEEDINGS AT TRIAL**

Petitioner was eventually indicted in Navajo County Superior Court on 35 charges of attempted second degree murder, aggravated assault, endangerment, and child abuse. (Exhibit DD, Indictment.)  The state eventually dismissed all but 8 counts of aggravated assault, and one count of endangerment.  (Exhibit P, Mot. Dismiss.)

Petitioner proceeded to trial and was convicted of six counts of aggravated assault and one count of felony endangerment.  (Exhibit GG, Guilty Verdicts.)  Petitioner was acquitted on two counts of aggravated assault.  (Exhibit HH, Not Guilty Verdicts.)

On April 24, 2012, Petitioner was sentenced to concurrent presumptive sentences of either 7-1/2 or 3-1/2 years on the six aggravated assault counts, and a concurrent sentence of 2-1/4 years on the endangerment charge.  (Exhibit NN, Sentence.)

**C.  PROCEEDINGS ON DIRECT APPEAL**

Petitioner filed a direct appeal asserting: (1) a denial of due process by denying medical attention and access to legal materials to Petitioner; (2) denial of due process by lack of timely disclosures; (3) Petitioner's motion for new trial was wrongly denied; and (4) the motion to depose Petitioner's mother was wrongly denied.  (Exhibit 00, Opening Brief.)

In a Memorandum Decision issued May 7, 2013 (Exhibit SS), the Arizona Court of Appeals rejected the claims, and affirmed Petitioner's convictions and sentences.

Petitioner then filed a Petition for Review by the Arizona Supreme Court (Exhibit TT), which was summarily denied on September 16, 2013 (Exhibit YY).

Petitioner then filed Petition for Writ of Certiorari with the U.S. Supreme Court,

which was summarily denied on April 7, 2014 (Exhibit AAA).   A Petition for Rehearing was summarily denied on June 2, 2014 (Exhibit CCC).


### D.  PROCEEDINGS ON POST-CONVICTION RELIEF

On April 25, 2013, during the pendency of Petitioner's direct appeal with the Arizona Court of Appeals, Petitioner filed a Notice of Post-Conviction Relief (Exhibit RR).  Counsel was appointed (Exhibit UU, M.E. 5/8/13) and replaced twice (Exhibit XX, Order 8/13/13; Exhibit BBB, Order 4/28/14).  The matter was set for a status conference on September 29, 2014.   No further action in this proceeding has been reported by the parties, and it is assumed that the proceeding remains pending.


### E.  PRESENT FEDERAL HABEAS PROCEEDINGS

**Petition** - Petitioner commenced the current case by filing through counsel his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on June 8, 2014 (Doc. 1).  Petitioner's Petition lists in its summary three grounds for relief (*id.* at 5):

1.  his due process rights were violated where he was removed from necessary medications and then was forcibly medicated so that he could not participate in his defense;

2.  his due process rights were violated where the government failed to disclose evidence prior to trial that changed the nature of the case and by failing to disclose civil suits filed against two victims and witnesses; and

3.  the trial court abused its discretion when it denied Petitioner a new trial.

Those three grounds are identified by the Court in its service Order (Doc. 4 at 2).

The body of Petitioner's Petition includes a fourth ground for relief, both in its Table of Contents (Doc. 1 at 7) and in its argument (*id.* at 39, *et seq.*).  The substance of this ground is an assertion that Petitioner was persecuted by arresting officers based on his national origin, based in part on a mistaken belief as to Petitioner's mother's nationality because she had been photographed wearing a "hijab" for her Norwegian

passport (which Petitioner contends was solely to facilitate her travel to Iran for medical purposes).  The constitutional basis for this claim is not made explicit.

**Response** - On October 28, 2014, Respondents filed their Response ("Answer") (Doc. 9).  Respondents argue that Grounds 1 and 2 are without merit, and that Ground 3 is procedurally defaulted.  Respondents argue that Ground 4, which they characterize as an equal protection claim, is procedurally defaulted, and without merit.

**Reply** - On December 16, 2014, Petitioner filed a Reply (Doc. 12).  Petitioner argues Ground I is without merit.

Petitioner also included new arguments based upon the use of a stun belt restraint at trial, and based upon the failure to exclude the victim witnesses from the courtroom during trial.  "The district court need not consider arguments raised for the first time in a reply brief."  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  Moreover, the Court's scheduling Order, filed September 26, 2014 (Doc. 8) advised the parties that any motion to amend the petition was due within 14 days of the filing of the answer.  No such motion was timely filed.

### III. APPLICATION OF LAW TO FACTS

#### A.  GROUND ONE: DUE PROCESS RE MEDICATIONS

#### 1. Background

**The Claim** - In his Ground 1, Petitioner argues that his due process rights were violated where he was removed from necessary medications and then was forcibly medicated so that he could not participate in his defense.  Petitioner alleges:

> Petitioner had been taking medication, under the supervision of a doctor, since he suffered his neck injury in the Chicago assault years before. Since his neck surgery three years before the Winslow incidents, Mr. Larsgard had been gradually reducing his prescribed dosage. Petitioner had taken his medication as prescribed the night before the incident. After that dose, Mr. Larsgard was not given any more of the medication prescribed by his physician. Throughout the time Mr. Larsgard and his trial counsel were preparing for trial, Mr. Larsgard went without necessary medication. This severely hampered his ability to assist his counsel and prepare for trial.

4

(Petition, Doc. 1 at 15.)   Petitioner further alleges:

> Unfortunately, Petitioner was denied these medications by the jail staff. He went through withdrawals and became delirious at the arraignment hearing and told the court he was a different person. He was put on suicide watch because the medications he received in prison did not abate his longstanding chronic pain. He felt forced to take the prison medications because he assumed they would have more of a positive effect than completely stopping all medication. The new medications made him restless, cloudy, unresponsive, nauseous, and largely apathetic toward life. He suffered from sleeplessness because the pain was intolerable.

(*Id.* at 25 (citations omitted).)  Petitioner argues:

> When he was denied his prescribed medication, Petitioner was given a true Hobson's choice: he could have no medication at all, therefore experiencing withdrawal and possible life threatening seizures, or he could submit to the will of the jail personnel and take whatever medications they provide in the hopes they would offer some respite from the pain.

(Petition, Doc. 1 at 26.)

**State Court Findings and Ruling** - In addressing this claim the Arizona Court of Appeals summarized the record as follows:

> On the first day of trial, Larsgard filed a motion asking the court to order the Navajo County Jail to administer the pain medications that had been prescribed by his treating doctor in Norway for chronic pain because the medication provided to him by jail medical staff the previous five months left him in "constant pain." The trial court denied the motion, reasoning that it did not make sense the day before trial to change the medications Larsgard had been on for months and that it was not in a position to determine the correct medications "without having some guidance."
>
> Larsgard renewed his request two days later when he read an e-mail from his doctor in Norway explaining that Larsgard had been prescribed unusually high dosages of opioids, including oxycodone, to allow him to participate in the activities of daily life. The court advised Larsgard to forward the e-mail to the jail "and let them do what they need to do." Larsgard did not pursue the matter further until he again raised the issue in a motion for new trial. The court denied the motion for new trial, finding that "Mr. Larsgard was engaged fully in the trial of his case, taking notes, whispering with investigators, testifying lucidly and clearly and confronting [sic] with counsel, and he did not appear tired or out of it."
>
> During sentencing, Larsgard testified that he was distracted at trial by the pain, twice felt he was about to fall asleep because of difficulty in sleeping at night, and "was not able to reach my full potential as far as focus.". He acknowledged, however, that he was able to hear all of the witnesses testify, and to answer questions when he testified. He testified that he "could have done better" if he had different medication, but he did not give any specific examples.

(Exhibit SS, Mem. Dec. at 3-4.)  The appellate court concluded that the record "fails to support" Petitioner's claims of being forcibly medicated or impaired. (*Id.* at 4.)   The court held:

> In summary, Larsgard has failed to present evidence demonstrating that the unidentified medications that the jail medical staff provided him significantly affected his access to counsel or his ability to participate in his own defense. The trial court had the opportunity to observe Larsgard throughout the trial, and found that he was fully engaged in the trial and was able to and did communicate with counsel. The trial court's observations are entitled to substantial deference, and we find no error that requires setting aside the convictions and sentences and ordering a new trial.

(*Id.* at 5 (citations omitted).)

**Response** – Respondents argue that Petitioner fails to show that the Arizona court's resolution of the claim was "contrary to, or involved an unreasonable application of, clearly established federal law."  (Answer, Doc. 9 at 17.)   Respondents argue that Petitioner has cited only to cases involving the forcible administration of medications, not the denial of medications or voluntary ingestion of alternative medications. "Petitioner has failed to cite any authority, let alone Supreme Court precedent, for the proposition that a pretrial detainee is entitled to receive particular medication while incarcerated pending trial." (*Id.* at 18.)

Respondents further argue that Petitioner has failed to meet his burden of overcoming the presumption of correctness attached to the finding of the Arizona Court of Appeals that Petitioner's claims of being impaired at trial were unsupported.  (*Id.* at 19), and that the record supports those findings (*id.* at 19-22).

**Reply** – In his Reply, Petitioner argues that the case law concerning forcible medication applies because Petitioner was threatened with being placed on suicide watch/protective custody if he did not take the medications given by the jail.  (Doc. 12 at 1-2.)

**2.  Habeas Standards of Review**

While the purpose of a federal habeas proceeding is to search for violations of

federal law, not every error justifies relief.

**Errors of Law** - "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U. S. 19, 24– 25 (2002) (per curiam).  To justify habeas relief, a state court's decision must be "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" before relief may be granted.  28 U.S.C. §2254(d)(1).

A habeas petitioner "need not produce a 'spotted calf' on the precise issue at hand to warrant habeas relief…it is sufficient that the [asserted violation] offends the principles previously enunciated by Supreme Court precedent." *Bradley v. Duncan*, 315 F.3d 1091, 1101 (9th Cir. 2002).

**Errors of Fact** -  Federal courts are further authorized to grant habeas relief in cases where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  "Or, to put it conversely, a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).

Moreover, a state prisoner is not free to attempt to retry his claims in the federal courts by presenting new evidence.  There is a well-established presumption of correctness of state court findings of fact.  This presumption has been codified at 28 U.S.C. § 2254(e)(1), which provides that "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner has the burden of proof to rebut the presumption by "clear and convincing evidence."

**Applicable Decisions** – In evaluating state court decisions, the federal habeas court looks through summary opinions to the last reasoned decision.  *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  In this instance, that is the decision of the Arizona Court of Appeals on Petitioner's direct appeal (Exhibit SS, Mem. Dec.).

**No Decision on the Merits** – The limitations of 28 U.S.C. § 2254(d) only apply where a claim has been "adjudicated on the merits in State court." Thus, where a petitioner has raised a federal claim to the state courts, but they have not addressed it on its merits, then the federal habeas court must address the claim *de novo*, and the restrictive standards of review in § 2254(d) do not apply. *Johnson v. Williams*, 133 S.Ct. 1088, 1091-92 (2013). *See id.* (adopting a rebuttable presumption that a federal claim rejected by a state court without being expressly addressed was adjudicated on the merits).

## 3. Applicable Substantive Standards

**Primacy of Competence** - The parties expend significant energy discussing whether Petitioner's ingestion of the jail's medication was actually voluntary,[1] whether the types of medications were anti-psychotics,[2] and whether the state had an obligation to provide Petitioner his previously prescribed medications.

If this case were a civil rights suit under 42 U.S.C. § 1983, or a pretrial suit to enjoin state action, then all of those considerations would be highly relevant to balancing

---

[1] In *Benson*, *infra* the Ninth Circuit went beyond the forced medication scenario, and applied the principles of *Riggins, infra* (the landmark case on the impacts of competency at trial for medicated defendants) to claims that the otherwise voluntary ingestion of the medication had been coerced or rendered unknowing because of deficient disclosures. 304 F.3d at 882-885. Indeed, in *Riggins* the involuntariness was based upon the defendant's motion "to terminate administration." 504 U.S. at 135. Here, Petitioner had objected to the substitution of the medications. (*See* Exhibit X, Motion for Medications; Exhibit SS, Mem. Dec. at 3.)

[2] In *Benson*, which involved "psychotropic antidepressants" rather than anti-psychotics, the Ninth Circuit found that *Riggins* was not limited to anti-psychotics:

> The liberty interest at stake applies to any forced medication, and that interest is heightened with respect to antipsychotic drugs like Mellaril that "alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes." The right to a fair trial, the [*Riggins*] Court emphasized, could be violated wherever the drugs in question create the "possibility that the substance of [the defendant's] own testimony, his interaction with counsel, or his comprehension at trial [could be] compromised."

*Benson*, 304 F.3d at 881, n. 7 (quoting *Riggins*).

the defendant's liberty interests with the state's purported interests justifying the medications. *See e.g. Washington v. Harper*, 494 U.S. 210 (1992) (§ 1983 case); *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175 (9th Cir. 2002) (same); *Sell v. U.S.*, 539 U.S. 166 (2003) (pretrial challenge); and *U.S. v. Loughner*, 672 F.3d 731 (9th Cir. 2012) (same).

But this is a habeas corpus proceeding in which Petitioner seeks to be freed from the effects of his criminal conviction.

In this context, at the end of the day, the only relevant consideration was whether Petitioner was competent to stand trial.

If, for example, Petitioner had been tied to a bed and forcibly given antipsychotic medications intravenously, he would still have to show that he was rendered incompetent at trial. *See e.g. Riggins v. Nevada*, 504 U.S. 127 (1992).

On the other hand, for example, if Petitioner had secretly (without knowledge or participation of state officials) refused medications prescribed by his personal physician and ingested other medications, his conviction would still have to be set aside if he were rendered incompetent. *See Propriety of Criminal Trial of One Under Influence of Drugs or Intoxicants at Time of Trial,* 83 A.L.R.2d 1067  § 3 (1962).

And, even if Petitioner landed somewhere in the middle, having voluntarily ingested the medication, but purportedly only under coercion, he still would be obligated to show he was incompetent.  *See e.g. Benson v. Terhune*, 304 F.3d 874, 881 (9th Cir. 2002).

**Applicable Standard for Claims of Incompetence** – A defendant that "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171–72 (1975). And "the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Id.* at 172.  The standard for competence is whether the defendant has "sufficient present ability to consult with

his lawyer with a reasonable degree of rational understanding" and has a "rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 Led.2d 824 (1960) (*per curiam*) (internal quotation marks omitted).

Rather than attempting to assess mental health, "[r]equiring that a criminal defendant be competent has a modest aim:  It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993).   "Not all people who have a mental problem are rendered by it legally incompetent." *Bouchillon v. Collins*, 907 F.2d 589, 593 (5th Cir. 1990).  In a footnote, the *Bouchillon* court noted: "We venture to guess that if every accused were to be adjudged incompetent who was rendered depressed or apathetic at finding himself incarcerated and indicted on felony charges, few would ever be tried." *Id*. at 594, note 17.

That standard is the same in the context of voluntary medication or intoxication. *See e.g. Sturgis v. Goldsmith*, 796 F.2d 1103, 1109-1110 (9th Cir. 1986) (applying competence hearing standard from *Pate v. Robinson*, 383 U.S. 375 (1966) to voluntary medication); *U.S. v. Howard*, 381 F.3d 873, 878 (9th Cir. 2004) (competence of defendant taking pain medications defined as "ability to understand the proceedings and to assist counsel in preparing a defense, citing *Dusky*).

And, the standard is the same in the context of involuntary medication. For example, in *Benson*, where the defendant had been administered a cocktail of pain medications and psychotropic antidepressants, the Ninth Circuit applied a prejudice standard, deciding whether the defendant "had at least a minimum rational understanding of the trial proceedings—and the ability rationally and coherently to participate in them." 304 F.3d at 885.

It is important to note that the required prejudice is to the defendant's mental state, not some specific alteration of the proceeding.  Thus, in *Riggins*, the Court found a basis for relief where it was "clearly possible" that the treatment had an effect on the

defendant's appearance, testimony, or ability to follow the proceedings or communicate with counsel. 504 U.S. at 137.  But, the Court rejected a requirement for a showing of actual prejudice to the outcome of the trial:

> Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different if Riggins' motion [to stop medications] had been granted would be purely speculative. We accordingly reject the dissent's suggestion that Riggins should be required to demonstrate how the trial would have proceeded differently if he had not been given [antipsychotic medications].

504 U.S. at 137.

Finally, the determination of competence is a "fact" question, and accordingly a state court determination of competence is entitled to a presumption of correctness in a federal habeas proceeding.  *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *Torres v. Prunty*, 223 F.3d 1103 (9th Cir. 2000); 28 U.S.C. § 2254(e)(1).

**<u>No Procedural Component Claim</u>** -  Due process rights related to competency to stand trial encompass not only a substantive component (the right to not be tried while incompetent), but also a procedural component (the right to have an adequate and even *sua sponte* hearing on incompetence).  *See e.g. Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2003). The undersigned finds no indication that Petitioner asserts a deficiency in the process afforded to him by the state court with regard to his competence to stand trial.

Petitioner does complain that "the process by which the jail refused Dr. Stokke's advice was unreasonable because it in essence allowed the jail's nurse practitioner to trump medical prescriptions made by Petitioner personal physician, Dr. Stokke." (Petition, Doc. 1 at 26.)  And, he contends that the trial court should have taken action to right that wrong.  (*Id.*)  However, these contentions relate to Petitioner's retained rights as a pre-trial detainee (e.g. to adequate health care), not to the trial court's resolution (or failure to address) of Petitioner's due process right to be competent to stand trial.

Petitioner also complains that "no reasonable determinations were made concerning the medical need" regarding his medications, citing *Riggins*.  (Petition, Doc.

1 at 27.)  However, medical need is not relevant to a procedural due process challenge to
failure to conduct a competency exam.  Rather, medical need is relevant to a due process
determination whether a prisoner may be medicated against his will.  In *Harper*, the
Court concluded that "forcing antipsychotic drugs on a convicted prisoner is
impermissible absent a finding of overriding justification and a determination of medical
appropriateness."  *Riggins*, 504 U.S. at 135.  However, *Harper* was a civil rights action,
not an appeal or habeas petition attacking a criminal conviction.  While *Riggins* involved
a criminal appeal, it analyzed *Harper* and its standard only as "useful background for
evaluating this claim" that the forced medication had rendered him incompetent to stand
trial.  504 U.S. at 133.  Indeed, the *Riggins* Court "presume[d] that administration of [the
medication] was medically appropriate."  *Id.*  Thus, a determination of the medical
necessity or appropriateness of Petitioner's medical treatment would have been only
incidentally relevant to a competency evaluation.

Were Petitioner appearing *pro se*, the Court might be obliged to liberally construe
the Petition to infer a procedural component competency claim.  *See Laws v. Lamarque*,
351 F.3d 919, 924 (9th Cir. 2003) (obligation to liberally construe *pro se* habeas
petitions).  However, Petitioner is represented by counsel who is equipped to make such
a procedural due process claim plainly.  *Cf. Peterson v. Lampert*, 319 F.3d 1153, 1159
(9th Cir. 2003) (for purposes of exhaustion, counseled and pro se filings need not be read
the same way).

**State Court Decision** – Here, the Arizona Court of Appeals found that "Larsgard
has failed to present evidence demonstrating that the unidentified medications that the
jail medical staff provided him significantly affected his access to counsel or his ability
to participate in his own defense."  (Exhibit SS, Mem. Dec. at 5.)

In coming to that conclusion, the Arizona Court of Appeals found that the record
did not support Petitioner's assertions that "the medications 'made him restless, cloudy,
unresponsive, nauseous, and largely apathetic toward life;' or … 'severely impacted his
ability to communicate with counsel, prevented him from reacting rapidly to trial

12

developments, sedated him, and diminished his ability to express emotions.'" (*Id.* at 4.)

Petitioner argues at length about the preferability of the medication regimen prescribed by his physician.   (Petition, Doc. 1 at 23-24.)   But that does nothing to establish Petitioner's incompetence at trial.

Petitioner does argue that:

> He went through withdrawals and became delirious at the arraignment hearing and told the court he was a different person. He was put on suicide watch because the medications he received in prison did not abate his longstanding chronic pain… The new medications made him restless, cloudy, unresponsive, nauseous, and largely apathetic toward life. He suffered from sleeplessness because the pain was intolerable.

(Petition, Doc. 1 at 25.)   He further argues that the substitution of medications "caused severe withdraw[al] affecting his testimony and other key moments at trial. He was unable to sleep, which affected his appearance and presentation before the jury." (*Id.*at 28.)

Petitioner proffers nothing further in his Reply to show that the state court got it wrong.   Instead, he simply segues into complaining about the use of a stun belt. (Reply, Doc. 12 at 2-3.)

Petitioner fails to show how these unsupported allegations amount to clear and convincing evidence that he was incompetent at trial.

<u>Delirious at Arraignment</u> - Assuming that Petitioner's mental condition at the arraignment were relevant to his competence at the trial some four months later, the record fails to support the contention that Petitioner was delirious or experiencing withdrawals at that hearing.   At most, the transcript reflects that at his first arraignment Petitioner told the Court his name was John Richard Bowman, despite having told his attorney and others his true name.   (Exhibit B, R.T. 10/3/11.)    At his second arraignment, eight days later, defense counsel confirmed that Petitioner's name (John Kristoffer Larsgard) "is correct."   (Exhibit F, M.E. 10/11/11.)  In the Pre-Trial Release Report, dated October 26, 2011, the officer reported: "The defendant stated that he is in fair physical health and is currently on a pain medication. In addition, the defendant

13

remarked that his emotional health is good." (Exhibit I at 1.)

Moreover, the record reflects that by the time of trial, Petitioner suffered sleeplessness and distraction associated with his pain, but no delirium or effects of withdrawals.

At sentencing, Petitioner reported:

> Q. Well, when you got medication from the jail what was it, was the stuff that your doctor had prescribed to you?
> A. No.
> Q. What was it? What was different about it?
> A. It was much much weaker and it was almost 56 days until I got it, and they also gave me some other stuff that I think I didn't react to well, too.
> Q. Did you feel like you were withdrawing from the medication you were taking?
> A. Well, with the level of medications I was on, my doctor and other doctors had told me you can never stop this right away. If it needs to be stopped it needs to be tapered, but it was my impression, based on the statements, that I could just go ahead and have some pain because these because I was such a horrible person and the worse criminal in this county, that they deliberately withheld medication from me to induce pain, and according to my doctor, swapping these medications suddenly could even be lethal. I think the jail exhibited recklessness.
> Q. Go ahead.
> A. I think the jail's conduct is deprived indifference to human life.
> Q. Well, were you on your regular prescribed medications from your doctor during the trial in this case?
> A. No. And while it didn't really show, it really hurts all the time and it is distracting.
> Q. Did you seem like you were as your normal self when you were in this trial?
> A. Well, I felt like I was my normal self, but I kind of had to stretch a little bit, I kind of had to try to focus, in spite of the pain. I was really tired when I was here. I felt like I was going to fall asleep a couple of times because the quality of sleep that I do get here is not good.

(Exhibit LL, R.T. 4/24/12 at 85-86.)  Petitioner made no mention of delirium or actual withdrawal effects from the medication change.  At most, he reported persistent pain, and being distracted or having to work to focus, and being tired from poor sleep.

On cross-examination, Petitioner clarified that his issues at trial related to the pain he experienced and kept him from being at his best at trial:

> Q. Today while you were testifying and while we are doing the sentencing, I think your normal self, but for the fact you might

14

be in a little more pain than normal, is that what I hear you saying?

A. A lot more pain. It doesn't show outward but it's --

Q. You are still able to focus what is going on around you and hear what is going on around you; is that correct?

A. Yes.

* * *

Q. Are you on the similar medication now that you were on at trial?

A. Yes, but they have increased the dose a little bit.

Q. So are you feeling any different now than you were at trial?

A. Just a little bit better. I'm able to focus a little bit more but it's still --

Q. At trial you were able to focus and take notes; is that correct?

A. I was able to take notes, but I feel I was not able to reach my full potential as far as focus, saying because my neck was constantly hurting and it's very distracting.

Q. You testified at trial, correct?

A. That is correct.

Q. You were present for the whole trial?

A. That is correct.

Q. You heard all the witnesses testify?

A. That is correct.

Q. When you testified at trial were you able to understand the questions that were asked of you and answer them?

A. I was able to understand the questions that were asked of me, however, I constantly felt distracted by pain.

Q. Were you able to answer the questions that were asked of you?

A. Yes I was, but I believe I could have done better with the correct medication.

* * *

Q. When I asked a question or Mr. Candelaria asked a question of you during trial, were you able to respond to those questions and give the answer that you wished to give?

A. I was able to respond to the questions, however, I feel that my responses might have been more detailed and better had I been on sufficient pain control.

(Exhibit LL, R.T. 4/24/12 at 96-100.)

Moreover, Petitioner failed to suggest to the probation officer any cognitive impairment from his medication issues.  At most he reported on-going pain:

> Reports prior to being incarcerated he was prescribed Oxycodone, Hydromorphone and Clonopin; however, since being in jail he receives a different type of medication that does not appear to be working and only helps "a little bit".

(Exhibit KK, Pre-Sentence Rep. at 8.)

In sum, Petitioner proffers nothing to show that he suffered from delirium or mental (as opposed to physical) effects from the changes in his medications other than

15

those incidental to his pain and related loss of sleep.

Suicide Watch – Petitioner argues that he was placed on suicide watch because of his chronic pain.  Suicidal people are not *ipso facto* incompetent to stand trial. *United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318-19 (9th Cir. 1997) ("we do not believe that every suicide attempt inevitably creates a doubt concerning the defendant's competency").

In the Pre-Sentence Report, dated April 17, 2012, the probation officer reported previous mental health treatment, depression, and wrist scars.  (Exhibit KK at 8.)  Thus there is some support in the record for the contention that Petitioner had suicidal tendencies.  However, there is nothing in the record to relate that to the medication issues or to demonstrate that the source of the tendencies affected his cognitive abilities:

> Reports he has never attempted suicide; however, available information from the jail indicates he was placed on suicide watch in the jail for approximately five (5) days; however, the defendant states he was not suicidal...he just wasn't eating. Additionally, according to a police report from Gurnee, Illinois, the defendant attempted/threatened suicide in 1997. It is unclear if he received any mental health counseling as a result of this incident.

(Exhibit KK at 8.)  At sentencing, Petitioner reported that he was threatened with being placed on suicide watch shortly after his arrest because he wasn't eating:

> Q. Well, let me ask you about the medications that you did receive in the jail. Were they the same as prescribed by your doctor?
> A. No. And I did not receive them, because when I first got in here I was told, I think it was a Saturday if I'm not mistaken, Saturday night, right?
> Q. All right.
> A. And I had a terrible headache as well that was developing. I was throwing up right away, and I was told that if to me just throwing up and being sick didn't make any sense for me to eat food, just to throw it right back up, but I was threatened with being put on suicide watch if I didn't eat food and throw it up, so essentially I would credit that as torture.

(Exhibit LL, R.T. 4/24/12 at 85.)

Further, Petitioner proffers nothing to relate his condition at the time of the suicide watch in October, 2011 to his mental condition at the time of trial in March, 2012.

16

<u>Sleeplessness and Malaise</u> – The record, at least insofar as it includes similar contemporaneous allegations from Petitioner, does provide some support Petitioner's allegations that he was sleepy and had trouble focusing because of his pain.  But due process does not require that a defendant be at his personal best to stand trial.

> To the extent that Williams's dazed or inattentive demeanor was before the trial judge, we agree with the Eleventh Circuit that "there is no constitutional prohibition against the trial and conviction of a defendant who fails to pay attention in court—whether out of indifference, fear, confusion, boredom, or sleepiness—unless that defendant cannot understand the nature of the proceedings against him or adequately assist counsel in conducting a defense."

*Williams v. Woodford*, 384 F.3d 567, 606 (9th Cir. 2004) (quoting *Watts v. Singletary*, 87 F.3d 1282, 1287 (11th Cir.1996)).

Similar to the defendant in *Williams*, Petitioner proffers nothing to suggest that he could not understand the nature of the proceedings or adequately assist counsel in conducting his defense.

It is telling that despite defense counsel twice making a record on the medication issue, counsel never once suggested that Petitioner had been rendered incompetent to stand trial.  *See Williams*, 384 F.3d at 605–06 (concluding that trial court did not error in not *sua sponte* ordering competency evaluation when the defendant did "not evidence any bizarre or irrational behavior" and defense counsel "at no point raised the issue of [the defendant's] competence to stand trial").

**<u>Competence Supported by Record</u>** – Moreover, Petitioner points to nothing to counter the state court's finding that Petitioner "was fully engaged in the trial and was able to and did communicate with counsel."  (Exhibit SS, Mem. Dec. at 5.)

In rejecting Petitioner' Motion for New Trial, the trial court observed:

> First, Mr. Larsgard was engaged fully in the trial of his case, taking notes, whispering with investigators, testifying lucidly and clearly and confronting with counsel, and he did not appear tired or out of it, so the motions for new trial on the grounds of not having certain medications is denied.

(Exhibit LL, R.T. 4/24/12 at 6.)

Petitioner's trial testimony reflects Petitioner as an articulate and responsive

17

witness.   (Exhibit DD, R.T. 3/22/12 at 175 *et seq*.; Exhibit EE, R.T. 3/23/12 at 1 *et seq*.)

For example, Petitioner was focused enough to independently seek clarification of a

compound question on cross-examination:

> Q.  Does that mean you were somewhat frustrated or angry about the accident that happened earlier that morning? Is that a yes or no. Does that mean you were frustrated or angry about the accident?
> A. I ask you to please split it up because you are asking yes or no.
> Q. Were you angry?
> A. I was not angry.
> Q. Were you frustrated?
> A. I was frustrated.

(Exhibit EE, R.T. 3/23/12 at 54.)

The undersigned finds no basis to conclude that the state court's competency

determination was an unreasonable determination of the facts before it.

**No Basis for Evidentiary Hearing** - Petitioner does request an evidentiary

hearing.  (Petition, Doc. 1 at 40.)  Absent constraints under the AEDPA, "[i]n a habeas

proceeding, a petitioner is entitled to an evidentiary hearing on the issue of competency

to stand trial if he presents sufficient facts to create a real and substantial doubt as to his

competency, even if those facts were not presented to the trial court." *Boag v. Raines*,

769 F.2d 1341, 1343 (9th Cir.1985) (citation omitted).[3]  *See Deere v. Woodford*, 339

F.3d 1084, 1086 (9th Cir. 2003), as amended on denial of reh'g (Oct. 2, 2003) (applying

*Boag* to pre-AEDPA case).  However, Petitioner fails to present facts (as opposed to bald

allegations) to create a real and substantial doubt as to his competency.

At best, Petitioner provides the bald and conclusory assertions that his "lack of

medications severely impacted his ability to communicate with counsel, prevented him

from reacting rapidly to trial developments, sedated him, and diminished his ability to

express emotions." (Petition, Doc. 1 at 28.)  He points to no specific point of the trial in

which he was hampered in his participation, proffers no evidence from counsel of

---

[3] Conversely, where a procedural component competency claim asserting a failure to conduct a competency hearing, the habeas court is limited to the record before the trial judge. *See Davis v. Woodford*, 384 F.3d 628, 645 (9th Cir.2004); *Williams v. Woodford*, 384 F.3d 567, 604 (9th Cir.2004) (as amended).

difficulties in their communication, provides no particulars on the types or amounts of medications he was actually provided or medical authority to support his asserted effects, and suggests no witnesses who would corroborate his allegations.

Even so, this case is subject to the AEDPA. Petitioner is not entitled to relief merely because in light of new evidence this habeas court might conclude the state court reached the wrong conclusion. Rather, Petitioner must show that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Petitioner proffers nothing to show why the Arizona Court of Appeals' determination was unreasonable based on the record before it. To the contrary, for the reasons discussed above, the state court's decision appears to be an eminently reasonable determination. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.")

**Presumption of Correctness Not Overcome** – As discussed hereinabove, the state court's determination on Petitioner's competency is a factual determination. Under 28 U.S.C. § 2254(e)(2), that determination is "presumed to be correct." Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." Petitioner's unsupported assertions do not provide clear and convincing evidence that he was incompetent at the time of trial.

Accordingly, Ground 1 is without merit, and must be denied.


**B. GROUND 2: DISCLOSURES**

**1. Background**

**Claims** - In his Ground 2, Petitioner argues that his due process rights were violated where the government failed to disclose evidence prior to trial that changed the nature of the case and by failing to disclose civil suits filed by two victim witnesses. (Petition, Doc. 1 at 30, *et seq.*) This ground consists of three separate claims.

In the first part of this ground, Petitioner argues that the state court violated Petitioner's due process rights when it allowed the prosecution to disclose an expert witness and his lab report less than 30 days before trial, only allowing the defense a continuance as a result.  As a result, Petitioner argues the "State's theory changed from crimes based upon the influence of prescription drugs to something akin to 'road rage.'"[4] Petitioner suggests this belated disclosure violated his speedy trial rights.  (*Id.* at 30-31.)

In the second part, Petitioner argues that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose that a principal witness, the booking officer, would testify that "Petitioner acted 'oddly' and 'only' wanted to give a written statement," in contradiction of Petitioner's trial testimony, and failed to obtain the video which Petitioner contends would have corroborated his version.  (Petition, Doc. 1 at 33.)

In the third part, Petitioner argues that the state failed to disclose the fact that two of the victims had filed civil lawsuits against Petitioner, which Petitioner could have used to impeach them.  (*Id.* at 34-35.)

**Response** – Respondents argue there is no clearly established Supreme Court precedent to support part 1 of Ground 2, and the state court's rejection of the claim was not unreasonable. (Answer, Doc. 9 at 28 *et seq.*)

With regard to Part 2, Respondents argue that the officer's testimony was consistent with her grand jury testimony, and that the state was unaware of any video, and there was no evidence that the video would have shown Petitioner or his demeanor.  (*Id.* at 30.)  With regard to Part 3, Respondents argue that the prosecution was unaware of the suits, and Petitioner had failed to identify the purported victim litigants to allow verification that such suits existed.  (*Id.* at 31.)

**Reply** – Petitioner does not address Ground 2 in his Reply

**State Court Decision** -  The Arizona Court of Appeals rejected the first part of Petitioner's claim by concluding that in the face of the delayed disclosure of the expert

---

[4] To the contrary, it appears that the state's theory shifted from road rage to being under the influence.

and his report, the sanction of a continuance was proper under the Arizona Rules. (Exhibit SS, Mem. Dec. at 6-7.)

With regard to the second part of this Ground 2, the court found that Petitioner had failed to raise a claim concerning the booking tape at trial, and reviewed for "fundamental error."  The court then rejected the claim because Petitioner had failed to prove the existence of the booking tape, that it would have been exculpatory, or that the outcome at trial would have been different.  (*Id.* at 7-9.)

With regard to the third part, the court found no duty under *Brady* to search out information held only by a victim, as opposed to the prosecution or police, that Petitioner could have discovered the information, and in light of the lack of surprise of the suits that the outcome at trial would not have been different.  (*Id.* at 9-10.)

## 2.  Part One: Lab Expert and Report

**Speedy Trial** –  To the extent that Petitioner intends part 1 of Ground 2 to assert a speedy trial claim, Petitioner fails to support the claim.[5]  "[T]he Supreme Court [has] articulated a four-part test to determine when government delay has abridged the Sixth Amendment right to a speedy trial. The factors to be considered include: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to speedy trial; and (4) the prejudice caused by the delay. No single factor is necessary or sufficient."  *McNeely v. Blanas*, 336 F.3d 822, 826 (9th Cir. 2003) (citing *Barker v. Wingo,* 407 U.S. 514, 530 (1972)).

Petitioner references Arizona's speedy trial deadline, but that state rule does not define Petitioner's constitutional speedy trial rights.  "Indeed, when defining that right, the [*Barker*] Court eschewed the rigid limitations contained in state statutes and adopted a more fluid balancing test."  *Wells v. Petsock*, 941 F.2d 253, 256 (3d Cir. 1991).

---

[5]  Petitioner proffers nothing to show that he has exhausted his state remedies as to this claim.  Respondents,understandably, do not identify nor address the claim.  Because the undersigned finds the claim wholly without merit, the exhaustion issue is not addressed.  *See*  28 U.S.C. § 2254(b)(2) ("application may be denied on the merits, notwithstanding the failure of the application to exhaust").

"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530-31. "Depending on the nature of the charges, the lower courts have generally found post-accusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. U.S.*, 505 U.S. 647, 652, n. 1 (1992). The Ninth Circuit has recognized that a sixth-month delay is a "borderline case," although there is a general consensus among the other courts of appeals that eight months constitutes the threshold minimum. *U.S. v. Gregory*, 322 F.3d 1157, 1162 (9th Cir. 2003). The Speedy Trial requirement is triggered when either a formal indictment or information is filed or upon arrest and holding to answer a criminal charge. *United States v. Marion*, 404 U.S. 307, 320 (1971).

Here, the incident occurred on September 24, 2011. (Exhibit D, Indictment.) Petitioner was placed under arrest essentially immediately thereafter, and he proceeded to trial less than six months later, on March 14, 2012. (Exhibit Y, R.T. 3/14/12.) This is less than what the Ninth Circuit considers "borderline." *Gregory*, 322 F.3d at 1162. Whether delay is presumptively prejudicial is primarily determined by the nature and complexity of the crime. For example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531. Petitioner proffers nothing unique about his case to suggest that the delay of less than six months was somehow presumptively prejudicial delay.[6] Petitioner was charged with *inter alia* attempted murder of a number of victims arising out of two distinct sets of acts (albeit part of a continuing incident), and ultimately convicted of *inter alia* aggravated assault of a number of victims, all substantial charges.

"Unless there is a delay which is presumptively prejudicial, there is no need to

_____

[6] Petitioner does complain about his incarceration without proper medication, that might be a factor in determining what actual prejudice resulted from the delay, but it is not relevant to whether the length of the delay was presumptively prejudicial.

1  inquire further." *United States v. Geelan*, 520 F.2d 585, 587 (9th Cir. 1975).  Because

2  Petitioner has not shown presumptively prejudicial delay, further analysis is not required

3  to determine that no speedy trial violation occurred.

4      **State Law Claim** – To the extent that part one of Ground 2 is simply founded

5  upon a violation of state law, the claim is not cognizable on habeas review.  A state

6  prisoner is entitled to habeas relief under 28 U.S.C. § 2254 only if he is held in custody

7  in violation of the Constitution, laws or treaties of the United States.  Federal habeas

8  relief is not available for alleged errors in the interpretation or application of state law.

9  *Estelle v. McGuire*, 502 U.S. 62 (1991).

10      **Due Process Violation** - Further, violations of state law, without more, do not

11  deprive a petitioner of due process.  *Cooks v. Spalding*, 660 F.2d 738, 739 (9th Cir.

12  1981), *cert. denied,* 455 U.S. 1026 (1982). It has long been understood that a state may

13  violate its own law without violating the United States Constitution.  *Gryger v. Burke*,

14  334 U.S. 728, 731 (1948).

15          We cannot treat a mere error of state law, if one occurred, as a
denial of due process; otherwise, every erroneous decision by a state

16          court on state law would come here as a federal constitutional
question.

17  *Id.*

18      Rather, to qualify for federal habeas relief, an error of state law must be

19  "sufficiently egregious to amount to a denial of equal protection or of due process of law

20  guaranteed by the Fourteenth Amendment." *See Pully v. Harris*, 465 U.S. 37, 41 (1984).

21      To sustain such a due process claim founded on state law error, Petitioner must

22  show that the state court "error" was "so arbitrary and fundamentally unfair that it

23  violated federal due process."  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.

24  1991) (quoting *Reiger v. Christensen*, 789 F.2d 1425, 1430 (9th Cir.1986)).   To receive

25  review of what otherwise amounts to nothing more than an error of state law, a petitioner

26  must argue "not that it is wrong, but that it is so wrong, so surprising, that the error

27  violates principles of due process"; that a state court's decision was "such a gross abuse

28  of discretion" that it was unconstitutional.  *Brooks v. Zimmerman*, 712 F.Supp. 496, 498

(W.D.Pa.1989).

Here, Petitioner has failed to show that the trial court's decision was erroneous under state law.  The Arizona Court of Appeals concluded that the trial court had not abused its discretion in responding to the delayed disclosure by imposing the continuance as a sanction.  (Exhibit SS, Mem. Dec. at 6-7.)    Even if this Court could conclude to the contrary, Petitioner proffers nothing to suggest that the state court's actions were so egregiously wrong that it amounted to a denial of due process.

**<u>Brady Violation</u>** - In *Brady*, the Supreme Court held that a defendant's due process rights are violated when the state fails to disclose to the defendant prior to trial "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused, and even an inadvertent failure to disclose may constitute a violation. *See United States v. Agurs*, 427 U.S. 97, 107, 110 (1976). As the Supreme Court has observed, *Brady* and its progeny "illustrate the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

This *Brady* claim is without merit for two reasons: (1) the information was not exculpatory; and (2) the disclosure was timely.

<u>Brady Does not Apply to Inculpatory Evidence</u> – *Brady* only applies to "favorable" information.    *Woods v. Sinclair*, 764 F.3d 1109, 1127 (9th Cir. 2014). "Moreover, the prosecutor's duty to disclose under Brady is limited to evidence a reasonable prosecutor would perceive at the time as being material and favorable to the defense." *Id.*   Petitioner proffers nothing to suggest that the expert opinion and lab report "showing the presence of drugs in his system a short time after the incident" (Exhibit SS, Mem. Dec. at 6) was "favorable," let alone that the prosecutor should have perceived it as such.

Petitioner essentially attempts to get around this by arguing that an earlier

24

disclosure of the evidence would have been "favorable" by allowing him additional time to rebut it.   However, under Petitioner's approach, all evidence to be introduced at trial would be "favorable."   Petitioner's argument is, in essence, an attempt to turn *Brady* into a general right to discovery. No such right exists.

> It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably.  There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one; as the Court wrote recently, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded…"

*Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (quoting *Wardius v. Oregon*, 412 U.S. 470, 474 (1973)).

Disclosure was Timely – Unlike the Arizona procedural rules, *Brady* does not establish a specific deadline by which disclosures must be made.  Rather, "[d]isclosure, to escape the *Brady* sanction, must be made at a time when the disclosure would be of value to the accused."  *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985).

Here, Petitioner proffers nothing to suggest that the disclosures of the expert and his report came so late as to not be of value. (The fact that it was not made in compliance with state disclosure rules does not establish it was too late to be of value.)  Rather, he simply makes the conclusory assertion that it "affected Petitioner's ability to prepare a defense." (Petition, Doc. 1 at 31.)  With one exception, the only facts alleged to support this claim are Petitioner's complaints that the continuance resulted, prolonging his detention without his previously prescribed medications.  Such incidental effects are not sufficient to support a *Brady* claim.

The one fact alleged by Petitioner that is relevant to the course of the trial is that Petitioner's private physician, "Dr. Stokke was called to negate the drug influence charges." (Petition, Doc. 1 at 31.)  However, Dr. Stokke actually testified at trial. (Exhibit DD, R.T. 3/22/12 at 5 *et seq.*)  Petitioner fails to proffer what other action would have been taken to counter the state's expert opinion had it been disclosed earlier. Moreover, the Arizona Court of Appeals found that "the State had timely disclosed that

it was waiting for the lab results, and the disclosure was not a surprise to Larsgard when he received them shortly before trial." (Exhibit SS, Mem. Dec. at 6.)  Petitioner proffers nothing to counter that finding.

Thus, Petitioner fails to show that the state failed to make timely disclosure, at least for *Brady* purposes, of its expert and his report.

**3.  Part Two: Disclosure of Booking Officer and Video**

Part Two of Ground 2 encompasses two distinct disclosures: (1) the disclosure that the booking officer would testify that Petitioner "acted 'oddly' and 'only' wanted to give a statement" (Petition, Doc. 1 at 33);  and (2) that there was a video camera in the booking room.

In addressing the claim in Part Two of Ground 2, the Arizona Court of Appeals summarized the factual background as follows:

> The issue of a possible "booking tape" first arose during the cross-examination of Winslow Police Officer Alicia Marquez, who had testified on direct examination that when Larsgard was in a holding cell after his arrest, he fluctuated between being "real calm" and "irate or aggressive," and he agreed only to make a written statement about the incident. Officer Marquez acknowledged that there were security cameras "in the location where Mr. Larsgard was being detained." Larsgard argued following this witness's testimony and in a motion for new trial that the prosecutor should have searched for and disclosed the booking tape.

(Exhibit SS, Mem. Dec. at 8.)

**Marquez Testimony** – At trial, Officer Marquez testified on direct examination by the prosecution as follows:

> Q. Before you even advised [the defendant] of his Miranda warnings did he make any statements as to whether he would give you a statement or not?
> A. He advised that he wanted to give only a written statement.

(Exhibit BB, R.T. 3/21/12 at 134.)

> Q. What did you notice about his demeanor while he was in that holding cell, if anything?
> A. It would change. He would be real calm and then he would become irate or aggressive, and then he would go back. It would just fluctuate.

Q. When you say irate, what do you mean?
A. Grunting. He would tighten his fist and then start shaking and kind of grunt and then we [sic] would be calm.

(*Id.* at 140.)

On cross-examination, Officer Marquez testified:

Q. Now, you've testified today a couple of times that Mr. Larsgard only wanted to give a written statement, right?
A. Correct.
Q. And but no where in your report does it say he only wanted to give a written statement, correct? That's a yes or no question.
A. There is no only, but that he wanted to give a written statement.
Q. But you agree that there's a difference between only wanting to give a written statement and wanting to give a written statement, correct?
A. I didn't put only in my report, but he stated he only wanted to give a written statement.

(*Id.* at 156.)

Q. Now, is there a security camera in the Winslow Police Department?
A. There are.
Q. Were their security cameras in the location where Mr. Larsgard was being detained?
A. There are.

(*Id.* at 171.)

Q. Now, again, looking at your police report, there's nothing in there about that you wrote on Mr. Larsgard ever acting oddly in the holding cell of the Winslow jail, right?
A. That's correct.
Q. It's correct, it's not there?
A. Correct.

(*Id.* at 172.)

**Petitioner's Testimony** – On direct examination by the defense, Petitioner testified:

Q. Did, at some point in time, did somebody give you a statement to write out a written statement?
A. After I had requested that I be given an opportunity to tell my side of the story.

(Exhibit EE, R.T. 3/23/12 at 44.)

Q. What did you do the evening you were arrested, after you left the hospital, to try to find out what was happening?
A. I kept asking Officer Marquez was at the, I believe

27

Winslow's Police station where I was being held in the holding cell, I kept asking her if I could -- when do I get to say my side of the story? They had been relatively nice in giving me a phone call before to my attorney, who was helping me with the matter in Chicago, and I'm not saying that they were directly rude to me or anything, because I don't want that to be inferred from or implied in my statement, but I was basically just being politely ignored when I kept asking.

Q. How many times did you ask to give your side of the story?

A. Three or four.

\* \* \*

Q. Did you tell her that you only wanted to make a written statement?

A. No, I did not specifically say that.

Q. What did you specifically say?

A. I believe I once said: When do I get to say my side of what happened here. When do I get to say anything. Do I get to make a statement.

Q. Any reason why you would only want to make a written statement?

A. No.

Q. And did you tell her that you only wanted to make a written statement?

A. No.

(*Id.* at 48-49.)

**State Court's Decision** – In rejecting this claim, the state court addressed only the failure to disclose the video tape.  The court reasoned:

First, he has failed to demonstrate the existence of a "booking tape" that would have clearly shown his demeanor or captured his remark that he would make only a written statement. The evidence did not show that the security camera was focused on Larsgard, that it was turned on, or that the tape was retained after that night. Second, he has failed to demonstrate that, had the booking tape shown his demeanor or captured his remarks, the evidence would have contradicted the officer's testimony. Finally, he has failed to demonstrate a reasonable probability that, even if the tape had contradicted this officer's testimony, the result of his trial would have been any different. On this record, we find that Larsgard has failed to demonstrate a Brady violation with respect to the booking tape.

(Exhibit SS, Mem. Dec. at 9.)

**Failure to Disclose Testimony re Statement** – Petitioner complains that the prosecution had not disclosed that Officer Marquez would testify that Petitioner "acted 'oddly' and 'only' wanted to give a written statement."  (Petition, Doc. 1 at 33.) But, *Brady* only applies to "favorable" information.   *Woods*, 764 F.3d at 1127.  Petitioner

28

fails to suggest how this evidence was favorable to him.  To the contrary, Petitioner acknowledges that it contradicted his own testimony.  Moreover, it tended to show that Petitioner was behaving oddly, which fit both versions of the prosecution's theory of the case, *e.g.* driving under the influence and road rage.

It is true that defense counsel attempted to impeach Officer Marquez by asserting that her report contradicted her testimony that Petitioner wanted to give only a written statement.  However, the impeachment evidence was not Officer Marquez's testimony, but her report – which failed to specify that Petitioner wanted to make only a written statement.  That favorable evidence, the report, was disclosed to the defense.

Moreover, even if the trial testimony was somehow "favorable" to the defense, Petitioner fails to suggest why the disclosure in the midst of trial was too late to be useful.  Indeed, the defense was able to impeach Marquez on the issue.  *United States v. Vgeri*, 51 F.3d 876, 880 (9th Cir. 1995) (no *Brady* violation from disclosure of informant's misconduct during trial where disclosure was "at a time when it was of value" to defense).

Further, Petitioner fails to suggest how this evidence was material.  *Brady* only applies to "material" evidence.  "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  Here, the evidence was not material because it was not favorable (as discussed above).  Even if viewed only for its impeachment uses (and thus deemed favorable), the value of the testimony was insignificant.  Marquez proffered a reasonable explanation that her report was simply incomplete, and her testimony that Petitioner's request to make a written statement was supplementary.  Moreover, Petitioner makes no suggest what additional evidence would have been presented at trial had earlier disclosure been made.  In light of the other evidence of Petitioner's conduct, the undersigned finds no basis to conclude that Petitioner would not have been convicted with an earlier disclosure.

1    Accordingly, this portion of Part 2 of Ground 2 is without merit.

2    **Video Tape** – Petitioner proffers nothing to counter the conclusion of the Arizona

3    Court of Appeals that he had failed to offer more than speculation about the contents of

4    the video tape.  Indeed, Petitioner bears the burden of showing both that the undisclosed

5    evidence was favorable and that it was material.  *Runningeagle v. Ryan*, 686 F.3d 758,

6    769 (9th Cir. 2012).  Petitioner is required to do more than "merely speculate" about

7    whether it would be.  *Id.*  Petitioner continues to offer mere speculation on these points.

8    Petitioner simply characterizes the video as "potentially exculpatory evidence."  (Petition

9    Doc. 1 at 34.)  On the record before even this habeas court, it is just as likely that the

10   video would not have depicted Petitioner's relevant conduct, or would have depicted

11   Petitioner behaving oddly and offering to only provide a written statement.

12   Accordingly, this portion of Part 2 of Ground 2 is without merit.

13

14   **4.  Part 3:  Civil Claims**

15   Petitioner argues that the prosecution failed to disclose that two of the State's

16   victims, T.C. and S.P, had begun civil litigation related to the incident, which could have

17   been used for impeachment.[7] The Arizona Court of Appeals rejected this claim on the

18   basis, *inter alia*, that the *Brady* disclosure obligation did not extend to information solely

19   in the possession of victims and Petitioner failed "to show that either police or the

20   prosecutor knew that the two witnesses had filed suit."  (Exhibit SS, Mem. Dec. at 10.)

21   Petitioner proffers nothing to suggest that this decision was wrong.

22   Petitioner complains that the prosecution failed to fulfill his "duty to search for

23   this evidence."  (Petition, Doc. 1 at 34.)   It is true that "the individual prosecutor has a

24   duty to learn of any favorable evidence known to others acting on the government's

25   behalf in the case." *Kyles*, 514 U.S. at 437.  But that does not turn the prosecution into

26   the defense's investigator.  "The prosecution is under no obligation to turn over materials

27   ───────────────

28   [7] The Arizona Court of Appeals observed that Petitioner failed to show that such lawsuits
     existed.  (Exhibit SS, Mem. Dec. at 10, n. 4.)  Petitioner still fails to proffer any evidence
     of their existence.

not under its control." *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991). "To comply with Brady the individual prosecutor has a duty to find any evidence favorable to the defendant that was known to those acting on the government's behalf. Such persons include other members of the prosecuting team, including police investigators working for the prosecution." *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002). Petitioner proffers nothing to suggest that the victims in this case were acting in the government's behalf beyond their role as a witness. A government witness is not a member of the prosecution team for purposes of *Brady*. *Id. See also Moon v. Head*, 285 F.3d 1301 (11th Cir. 2002) (Georgia prosecutor not charged with possessing information known to Tennessee officer testifying in Georgia case).

Accordingly, this portion of Ground 2 is without merit.

**5.  Summary re Ground 2**

For the reasons discussed herein, each of the three parts of Petitioner's Ground 2 are without merit.  Accordingly, Ground 2 must be denied.

**C.  GROUNDS 3 & 4: EXHAUSTION & PROCEDURAL DEFAULT**

In his Ground 3, Petitioner argues that there was insufficient evidence to support his convictions.  (Petition, Doc. 1 at 35-38.)  In Ground 4, Petitioner argues that he was persecuted on the basis of his national origin.  (*Id.* at 39-40.)

Respondents argue that Petitioner failed to exhaust his state remedies with regards to the claims in Grounds 3 and 4, and those remedies are procedurally defaulted, and thus these Grounds are barred from federal habeas review.  (Answer, Doc. 9 at 33-34, 41.)

**1. Exhaustion Requirement**

Generally, a federal court has authority to review a state prisoner's claims only if available state remedies have been exhausted.  *Duckworth v. Serrano*, 454 U.S. 1, 3

(1981) (*per curiam*). The exhaustion doctrine, first developed in case law, has been codified at 28 U.S.C. § 2254(b) and (c).  When seeking habeas relief, the burden is on the petitioner to show that he has properly exhausted each claim.  *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981)(*per curiam*), *cert. denied*, 455 U.S. 1023 (1982).

Ordinarily, "to exhaust one's state court remedies in Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-conviction relief pursuant to Rule 32." *Roettgen v. Copeland*,  33 F.3d 36, 38 (9th Cir. 1994).   Only one of these avenues of relief must be exhausted before bringing a habeas petition in federal court.  This is true even where alternative avenues of reviewing constitutional issues are still available in state court.  *Brown v. Easter*, 68 F.3d 1209, 1211 (9th Cir. 1995); *Turner v. Compoy*, 827 F.2d 526, 528 (9th Cir. 1987), *cert. denied*, 489 U.S. 1059 (1989).  "In cases not carrying a life sentence or the death penalty, 'claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them.'" *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005)(quoting *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999)).

## 2.  Procedural Default

Ordinarily, unexhausted claims are dismissed without prejudice.  *Johnson v. Lewis*, 929 F.2d 460, 463 (9th Cir. 1991).  However, where a petitioner has failed to properly exhaust his available administrative or judicial remedies, and those remedies are now no longer available because of some procedural bar, the petitioner has "procedurally defaulted" and is generally barred from seeking habeas relief.  Dismissal with prejudice of a procedurally defaulted habeas claim is generally proper absent a "miscarriage of justice" which would excuse the default.  *Reed v. Ross*, 468 U.S. 1, 11 (1984).

Respondents argue that Petitioner may no longer present his unexhausted claims to the state courts.  Respondents rely upon Arizona's preclusion bar, set out in Ariz. R. Crim. Proc. 32.2(a).  (Answer, Doc. 9 at 33, 41.)

**Remedies by Direct Appeal** - Under Ariz.R.Crim.P. 31.3, the time for filing a

1 direct appeal expires twenty days after entry of the judgment and sentence. Moreover, no

2 provision is made for a successive direct appeal.  Accordingly, direct appeal is no longer

3 available for review of Petitioner's unexhausted claims.

4     **Remedies by Post-Conviction Relief** – Under Arizona's waiver bars, Petitioner

5 can no longer seek review by a subsequent PCR Petition.[8]

6     Waiver Bar - Under the rules applicable to Arizona's post-conviction process, a

7 claim may not ordinarily be brought in a petition for post-conviction relief that "has been

8 waived at trial, on appeal, or in any previous collateral proceeding."   Ariz.R.Crim.P.

9 32.2(a)(3).   Under this rule, some claims may be deemed waived if the State simply

10 shows "that the defendant did not raise the error at trial, on appeal, or in a previous

11 collateral proceeding." *Stewart v. Smith*, 202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002)

12 (quoting Ariz.R.Crim.P. 32.2, Comments).  For others of "sufficient constitutional

13 magnitude," the State "must show that the defendant personally, "knowingly, voluntarily

14 and intelligently' [did] not raise' the ground or denial of a right." Id.  That requirement is

15 limited to those constitutional rights "that can only be waived by a defendant

16 personally." *State v. Swoopes*, 216 Ariz. 390, 399, 166 P.3d 945, 954 (App.Div. 2,

17 2007).  Indeed, in coming to its prescription in *Stewart v. Smith*, the Arizona Supreme

18 Court identified: (1) waiver of the right to counsel, (2) waiver of the right to a jury trial,

19 and (3) waiver of the right to a twelve-person jury under the Arizona Constitution, as

20 among those rights which require a personal waiver.  202 Ariz. at 450, 46 P.3d at

21 1071.  Claims based upon ineffective assistance of counsel are determined by looking at

22 "the nature of the right allegedly affected by counsel's ineffective performance. *Id*.

23     Here, none of Petitioner's unexhausted claims are of the sort requiring a personal

24 waiver.

25     Exceptions – Rule 32.2 does not bar dilatory claims if they fall within the

---

26 [8] Respondents do not raise, and the undersigned does not rely upon Arizona's time bar
27 for PCR petition. *See* Ariz. R. Crim. P. 32.4.  Arguably, any claim not precluded could be raised in the currently ongoing PCR proceeding, and thus escape the time bar.  The waiver bar under Rule 32.2, however, would not similarly be avoided, because the
28 claims were waived during the now completed direct appeal.

33

category of claims specified in Ariz.R.Crim.P. 32.1(d) through (h).  See Ariz. R. Crim. P.  32.2(b). Petitioner has not asserted that any of these exceptions are applicable to his claims.    Nor does it appears that such exceptions would apply.  The rule defines the excepted claims as follows:

> d. The person is being held in custody after the sentence imposed has expired;
> e. Newly discovered material facts probably exist and such facts probably would have changed the verdict or sentence. Newly discovered material facts exist if:
> (1) The newly discovered material facts were discovered after the trial.
> (2) The defendant exercised due diligence in securing the newly discovered material facts.
> (3) The newly discovered material facts are not merely cumulative or used solely for impeachment, unless the impeachment evidence substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence.
> f. The defendant's failure to file a notice of post-conviction relief of-right or notice of appeal within the prescribed time was without fault on the defendant's part; or
> g. There has been a significant change in the law that if determined to apply to defendant's case would probably overturn the defendant's conviction or sentence; or
> h. The defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found defendant guilty of the underlying offense beyond a reasonable doubt, or that the court would not have imposed the death penalty.

Ariz.R.Crim.P. 32.1.

Paragraph 32.1 (d) (expired sentence) generally has no application to an Arizona prisoner who is simply attacking the validity of his conviction or sentence.  Where a claim is based on "newly discovered evidence" that has previously been presented to the state courts, the evidence is no longer "newly discovered" and paragraph (e) has no application.  Here, Petitioner has long ago asserted the facts underlying his claims.  Paragraph (f) has no application where the petitioner filed a timely notice of appeal.  Paragraph (g) has no application because Petitioner has not asserted a change in the law since his last PCR proceeding.  Finally, paragraph (h), concerning claims of actual innocence, has no application to the procedural claims Petitioner asserts in this proceeding.

Therefore, none of the exceptions apply, and Arizona's waiver bar would prevent Petitioner from returning to state court. Thus, Petitioner's claims that were not fairly presented are all now procedurally defaulted.

### 3. Application to Petitioner's Claims

**a.  Ground 3 – Insufficiency of the Evidence** - In Ground Three of his Petition, Petitioner argues that there was insufficient evidence to support his convictions under *Jackson v. Virginia*, 443 U.S. 307 (1979).

Respondents argue that this claim was never raised to the Arizona Court of Appeals.

Petitioner does not address this contention in his reply.

In his Opening Brief, Petitioner did argue that the trial court abused its discretion in denying his Motion for New Trial based upon the contention that the verdict was contrary to the weight of the evidence.  (Exhibit OO at 30, *et seq.*)  In that argument, Petitioner generally raised the same factual arguments he asserts in Ground 3.

Here, Petitioner did not raise this claim as a federal claim.  He cited only state procedural rules and cases related to their application.  (Exhibit OO at 30.)  None of the state cases cited decided an issue of federal law.  *See State v. Ornelas*, 15 Ariz. App. 580, 490 P.2d 25 (1971);   *State v. McAvaney*, 106 Ariz. 149, 150, 472 P.2d 18, 19 (1970); and *Ainsworth v. State,* 37 Ariz. 330, 294 P. 271 (Ariz. 1930).

Failure to so alert the state court to the constitutional nature of the claim will amount to failure to exhaust state remedies.  *Duncan v. Henry*, 513 U.S. 364, 366 1995). While the petitioner need not recite "book and verse on the federal constitution," *Picard v. Connor*, 404 U.S. 270, 277-78 (1971) (quoting *Daugherty v. Gladden*, 257 F.2d 750, 758 (9th Cir. 1958)), it is not enough that all the facts necessary to support the federal claim were before the state courts or that a "somewhat similar state law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982)(*per curiam*).

Accordingly, this claim was not fairly presented to the Arizona Court of Appeals

on direct appeal.

In his Petition for Review to the Arizona Supreme Court, Petitioner again raised his factual contentions, but made no reference to any federal law or constitutional principles.  (Exhibit TT, Pet. Rev. at 5-6.)   Accordingly, this claim was not fairly presented to the Arizona Supreme Court.

Based upon the foregoing, Petitioner has failed to fairly present his federal clam in Ground 3 to the state courts.  For the reasons discussed hereinabove, Petitioner's state remedies are procedurally defaulted.

**b.  Ground 4 – Persecution on National Origin** – In Ground 4 of his Petitition, Petitioner argues that he was persecuted on the basis of his national origin.  (Petition, Doc. 1 at 39-40.)   Petitioner does not make the federal basis of this claim clear. Respondents construe this claim as asserting a denial of equal protection and assert that it is procedurally defaulted.  (Answer, Doc. 9 at 41.)  Petitioner does not challenge the construction, nor reply to the allegation of procedural default.

Accordingly, the undersigned construes Petitioner's Ground 4 to assert a denial of equal protection.

Although Petitioner generally alleges that his Grounds 1 through 3 were fairly presented on direct appeal (Petition, Doc. 1 at 20), he makes no similar allegation with regard to his fourth ground for relief.   The undersigned finds no portion of Petitioner's Opening Brief before the Arizona Court of Appeals or his Petition for Review to the Arizona Supreme Court that asserted an equal protection claim.  (*See* Exhibit OO, Opening Brief; Exhibit TT Petition for Review.)

Based upon the foregoing, Petitioner has failed to fairly present his clam in Ground 4 to the state courts.  For the reasons discussed hereinabove, Petitioner's state remedies are procedurally defaulted.

**4. Cause and Prejudice**

If the habeas petitioner has procedurally defaulted on a claim, or it has been

36

procedurally barred on independent and adequate state grounds, he may not obtain federal habeas review of that claim absent a showing of "cause and prejudice" sufficient to excuse the default. *Reed v. Ross*, 468 U.S. 1, 11 (1984).

"Cause" is the legitimate excuse for the default. *Thomas v. Lewis*, 945 F.2d 1119, 1123 (1991). "Because of the wide variety of contexts in which a procedural default can occur, the Supreme Court 'has not given the term "cause" precise content.'" *Harmon v. Barton*, 894 F.2d 1268, 1274 (11th Cir. 1990) (quoting Reed, 468 U.S. at 13), *cert. denied*, 498 U.S. 832 (1990). The Supreme Court has suggested, however, that cause should ordinarily turn on some objective factor external to petitioner, for instance:

> ... a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that "some interference by officials", made compliance impracticable, would constitute cause under this standard.

*Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citations omitted).

Petitioner proffers no cause to excuse his procedural default. The undersigned perceives none.

Both "cause" and "prejudice" must be shown to excuse a procedural default, although a court need not examine the existence of prejudice if the petitioner fails to establish cause. *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982); *Thomas v. Lewis*, 945 F.2d 1119, 1123 n. 10 (9th Cir.1991). Petitioner has filed to establish cause for his procedural default. Accordingly, this Court need not examine the merits of Petitioner's claims or the purported "prejudice" to find an absence of cause and prejudice.

## 5. Actual Innocence as Cause

The standard for "cause and prejudice" is one of discretion intended to be flexible and yielding to exceptional circumstances, to avoid a "miscarriage of justice." *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986). Accordingly, failure to establish cause may be excused "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually

1    innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (emphasis added).  Although
2    not explicitly limited to actual innocence claims, the Supreme Court has not yet
3    recognized a "miscarriage of justice" exception to exhaustion outside of actual
4    innocence.  *See* Hertz & Lieberman, *Federal Habeas Corpus Pract. & Proc.* §26.4 at
5    1229, n. 6 (4th ed. 2002 Cumm. Supp.).  The Ninth Circuit has expressly limited it to
6    claims of actual innocence.  *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008).

7         A petitioner asserting his actual innocence of the underlying crime must show "it
8    is more likely than not that no reasonable juror would have convicted him in the light of
9    the new evidence" presented in his habeas petition.  *Schlup v. Delo*, 513 U.S. 298, 327
10   (1995).  A showing that a reasonable doubt exists in the light of the new evidence is not
11   sufficient.  Rather, the petitioner must show that no reasonable juror would have found
12   the defendant guilty.  *Id*. at 329.  This standard is referred to as the "*Schlup*
13   gateway.*"  *Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2002).

14        Here, Petitioner makes no pretense of establishing his actual innocence.

15        Although Petitioner contends in Ground 3 that there was insufficient evidence to
16   support his conviction, a finding of "actual innocence" is not to be based upon a finding
17   that insufficient evidence to support the charge was presented at trial, but rather upon
18   affirmative evidence of innocence.  *See U.S. v. Ratigan*, 351 F.3d 957 (9th Cir. 2003)
19   (lack of proof of FDIC insurance in a  bank robbery case, without evidence that
20   insurance did not exist, not sufficient to establish actual innocence).

21        Petitioner proffers no new evidence to showing that no reasonable juror would
22   have found him guilty.  Accordingly his procedurally defaulted and procedurally barred
23   claims must be dismissed with prejudice.

24

25   **D. SUMMARY**

26        Petitioner's Grounds 1 and 2 are without merit and must be denied.  His Grounds
27   3 and 4 are procedurally defaulted, and he has failed to show cause and prejudice or
28   actual innocence to excuse his default.  Accordingly, those grounds must be dismissed

                                    38

with prejudice.

## IV.  CERTIFICATE OF APPEALABILITY

**Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment.  The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner.  Accordingly, a decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

**Standard Not Met** - Assuming the recommendations herein are followed in the district court's judgment, that decision will be in part on the  merits and in part on procedural grounds. To the extent that the claims are disposed of on the merits, under the

1  reasoning set forth herein, the constitutional claims are plainly without merit.  To the

2  extent the claims are disposed of on procedural grounds, jurists of reason would not find

3  it debatable whether the district court was correct in its procedural ruling.

4          Accordingly, to the extent that the Court adopts this Report & Recommendation

5  as to the Petition, a certificate of appealability should be denied.

6

7                             **V.  RECOMMENDATION**

8          **IT IS THEREFORE RECOMMENDED** that Grounds 3 (insufficient evidence)

9  and 4 (equal protection) of the Petitioner's Petition for Writ of Habeas Corpus, filed June

10  9, 2014 (Doc. 1) be **DISMISSED WITH PREJUDICE**.

11         **IT IS FURTHER RECOMMENDED** that the remainder of Petitioner's Petition

12  for Writ of Habeas Corpus, filed June 9, 2014 (Doc. 1) be **DENIED**.

13         **IT IS FURTHER RECOMMENDED** that, to the extent the foregoing findings

14  and recommendations are adopted in the District Court's order, a Certificate of

15  Appealability be **DENIED**.

16

17                        **VI. EFFECT OF RECOMMENDATION**

18         This recommendation is not an order that is immediately appealable to the Ninth

19  Circuit Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules*

20  *of Appellate Procedure*, should not be filed until entry of the district court's judgment.

21         However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties

22  shall have fourteen (14) days from the date of service of a copy of this recommendation

23  within which to file specific written objections with the Court.  *See also* Rule 8(b), Rules

24  Governing Section 2254 Proceedings.   Thereafter, the parties have fourteen (14) days

25  within which to file a response to the objections.  Failure to timely file objections to any

26  findings or recommendations of the Magistrate Judge will be considered a waiver of a

27  party's right to *de novo* consideration of the issues,  *see United States v. Reyna-Tapia*,

28  328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*),  and will constitute a waiver of a party's

right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

Dated: February 24, 2015

14-8092r RR 15 02 10 on HC.docx

James F. Metcalf
United States Magistrate Judge

41